**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NAEEM WALLER, <br><br>                 Plaintiff, <br><br><br>     v. <br><br><br> CITY OF PHILADELPHIA, <br> DENNIS DUSAK, JAMES GRIFFIN, and <br> WILLIAM GROSS <br><br>               Defendants. | CIVIL ACTION <br><br><br> NO. 24-cv- <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

## PRELIMINARY STATEMENT

1.      On June 15, 2002, Plaintiff Naeem Waller was arrested and charged with a murder he did not commit. The lack of evidence against Waller and co-defendant Devin Rouse was demonstrated by the fact that there were two hung juries before a conviction was finally obtained at the third trial. The difference between the third trial and the prosecution's previous two attempts was the testimony of jailhouse snitch Tyron Rouse, who was the co-defendant's cousin. By following a well-known pattern and practice of fabricating false evidence, Detective Dusak and Detective Griffin were able to conjure a convenient witness who had conveniently heard a pretrial confession during pre-trial detention.

2.      Solely on the basis of Tyron Rouse's testimony, Mr. Waller and Devin Rouse were convicted of murder on December 17, 2004. Both were sentenced to life without the possibility of parole.

3.      On February 8, 2022, the Philadelphia Court of Common Pleas heard the testimony of Timothy Moses, which conclusively showed that the testimony of Tyron Rouse back in December of 2004, was not credible. Timothy Moses, during a PCRA evidentiary hearing, told the Court that the murder for which Naeem Waller was serving a life sentence had actually been committed by other individuals. Based on this testimony, the Honorable Lillian Ransom vacated the conviction of Naeem Waller on May 24, 2022.

4.      The testimony of Timothy Moses completely undermined the inculpatory statements that Tyron Rouse gave more than two decades ago. The circumstances by which Tyron Rouse came to give untrue testimony were violative of Naeem Waller's civil rights as guaranteed by the United States Constitution. In particular, Detectives Dusak and Griffin engaged in willful deception by failing to disclose Tyron's significant mental health history. Also concealed was the record of prior misconduct committed by Dusak in fabricating evidence and obtaining false testimony from witnesses.

5.      The manner in which Tyron Rouse could be manipulated because of his mental health challenges is aptly displayed by the fact that he recanted his inculpatory statements and then recanted his recantation.

6.      Mr. Waller never had the benefit of knowing about Tyron Rouse's condition because that information was concealed by the Defendants. Mr. Waller also was denied the opportunity to properly cross-examine the detective who took Tyron Rouse's statement. When the third trial occurred in December of 2004, Dennis Dusak had already accumulated a record of misconduct that would have further undermined the Commonwealth's only evidence against Waller. The failure to provide this information violated Mr. Waller's right to due process and a fair trial.

7.      The actions and conduct of Defendants Dusak, Griffin, and Gross were the result of policies, practices, customs and deliberate indifference on the part of Defendant City of Philadelphia, including the failure to properly train and supervise officers assigned to investigate and prosecute homicides, and the failure to take disciplinary and remedial action against the defendant detectives and other who commit serious misconduct and abuses of authority.

<u>JURISDICTION</u>

8.      This action is brought pursuant to 42 U.S. § 1983 to redress the deprivation under color of law of the Plaintiff's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

9.      This Court has supplemental jurisdictions over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

<u>JURY DEMAND</u>

11.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

<u>PARTIES</u>

12.     Plaintiff Naeem Waller is a resident of Philadelphia, Pennsylvania, and at all times relevant to this Complaint, resided in the Eastern District of Pennsylvania.

13.     Defendant **CITY OF PHILADELPHIA** is a City of the First Class in the Commonwealth of Pennsylvania and at all times relevant hereto operated under the color of state law in creating and maintaining a Police Department and District Attorney's Office, was the employer of all individual Defendants, and was officially responsible for all policies, procedures, and practices of the Philadelphia Police Department (PPD) and the District Attorney's Office (DAO).

14.     Defendant **DENNIS DUSAK**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Dusak was assigned as a detective with the Homicide Unit at the time of this investigation.

15.     Defendant **JAMES GRIFFIN**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Griffin was assigned as a detective with the Homicide Unit at the time of this investigation.

16.     Defendant **WILLIAM GROSS**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Gross was assigned as a detective with the Homicide Unit at the time of this investigation.

17.     At all times relevant to this Complaint, the individual Defendants named above acted in concert and in conspiracy with one another to deprive Naeem Waller of his constitutionally protected rights.

<u>OPERATIVE FACTS</u>

18.     On April 12, 2002, Brian Birkelback, Cassandra Ketterer and Michael Birkelback were driving in Brian's car to meet friends at Rising Sun Avenue and Gilham Street in Philadelphia. Once they arrived at the corner, a number of other individuals piled into Brian's car.

19.     Three men then approached the vehicle to ask if the occupants wanted to purchase marijuana. One of the three men approached the driver side and the other two approached the passenger side of Brian Birkelback's car.

20.     During the interaction, Michael Birkelback shouted that they were being robbed. One of the men who approached the car then ordered all occupants to get out of the vehicle and hand over their valuables.

21.     Brian Birkelback got out of the driver side door and began to tussle with the man who had approached that side of the vehicle.

22.     One of the men who had approached from the other side of the Birkelback vehicle then fired a gun three times at Brian who was on the other side of the vehicle. One of the bullets struck the decedent in the back and killed.

23.     The shooter and one of the other men got into a vehicle and fled the scene. The third man who had approached the Birkelback vehicle fled the scene on foot.

24.     The night after the shooting, Cassandra Ketterer and Michael Birkelback were interviewed by local news and stated that they did not know who robbed them and could not identify the assailants.

25.     Ketterer initially told police that one of the perpetrators was a Puerto Rican male with freckles and bad teeth,

26.     A month after the shooting, on May 15, 2002, Michael Birkelback and Cassandra Ketterer were shown various photo arrays and were present for lineups. They were not able to identify Mr. Waller as one of the people who approached their car on the night of the shooting.

27.     Ketterer originally gave an identification of someone other than Mr. Waller.

28.     Michael Birkelback eventually gave a statement that Mr. Waller was one of the robbers, even though Birkelback had previously been unable to identify the participants.

29.     Mr. Waller was arrested on June 15, 2002. He and co-defendant Devin Rouse were tried for the first time on November 14, 2003, and again on April 14, 2004, with both proceedings ending in a hung jury. On December 17, 2004, the third trial concluded with a guilty verdict for both defendants.

30.     The difference between the Commonwealth's evidence at the last trial was the inclusion of testimony from Devin Rouse's cousin Tyron Rouse.

31.     Back on May 13, 2002, Tyron Rouse gave a statement to Detectives Dusak and Griffin which purported to say that Devin Rouse had confessed to Tyron in the early morning hours of April 13, 2002. According to Tyron, this confession took place at Tyron's house at 8628 Thouron Street in Philadelphia between one and two in the morning.

32.     The above-referenced statement was taken at the Police Administration Building after Detectives Dusak and Griffin had gone to collect Tyron Rouse from the Curran Frumhold Correctional Facility where Tyron was awaiting trial on other charges.

33.     The content of Tyron Rouse's statement is facially unreliable as it states that Devin came to Tyron's house and confessed to the killing. This is impossible because, as was

known by Dusak and the other defendants, Devin Rouse had been apprehended in the wake of the Birkelback shooting and had been subject to identification procedures and *was still in custody* at the time Tyron Rouse alleges that Devin came to the house and confessed.

34.     Although the Commonwealth had Tyron Rouse's statement well in advance of the first of Mr. Waller's three trials, Tyron did not testify until the third trial. With the benefit of 20/20 hindsight, it is easy to see why this is the case. Subsequent investigation has revealed the Tyron Rouse suffers from significant mental health challenges, including schizophrenia. Although this information was known to the Defendants before Tyron took the stand, the information was deliberately suppressed, thus violating Mr. Waller's right to due process and a fair trial.

35.     The Defendants also concealed the background of the principal detective on the case, Defendant Dennis Dusak. Without Dusak's having obtained Tyron Rouse's false statement, the Commonwealth would not have had sufficient evidence to charge, let alone convict, Naeem Waller.

36.     Thanks to recent revelations regarding extensive corruption and wrongdoing in the Philadelphia Police Department, there is now documentation of misconduct that predates Defendant Dusak's involvement in this case. Despite that fact that Dusak's wrongdoing has now contributed to millions of dollars in liability payment, the Defendants deliberately deceived Mr. Waller and denied him a fair trial by suppressing evidence of Dusak's prior misconduct:

   a.   *Anthony Wright* – In 1991 Anthony Wright was coerced into signing a false
        confession in which he admitted to the rape and murder of 77-year-old Louise
        Talley. Decades later Wright was exonerated by DNA evidence which provide that
        he could not have committed the crime. Dennis Dusak participated in that

investigation and obtained fabricated statements from various witnesses who
purported to confirm the false confession. Following his exonration, Anthony
Wright made a civil claim based on his wrongful conviction. That claim was
settled for more than $9.8 million.

b.  *Center City Jogger* – The 1995 murder of Kimberly Ernest in Center City
Philadelphia was another case involving a coerced confession and fabricated
evidence. The falsity of the confession was established in the criminal trial. After
acquittal, the defendants filed suit making claims that Dusak assisted in
fabricating evidence to help secure a wrongful conviction. The case was settled
with a $50,000 payment from the City of Philadelphia.

c.  *Gilyard and Felder* – Thomas Keel was murdered in 1995, but the Philadelphia
Police department was unable to solve the case until Detective Dusak re-
interviewed witnesses. Dusak obtained statements that implicated Eugene Gilyard
and Lance Felder. As a result, Gilyard and Felder were convicted and spent 15
years in prison until their convictions were overturned. In a later affidavit, one of
the "re-interviewed" witnesses described how Dusak had coerced the statement
and told the witness who to implicate. The City of Philadelphia was later
compelled to pay $3 million after Gilyard and Felder filed a civil lawsuit.

d.  Dusak testified at a deposition in the civil suit brought by Gilyard. In that
deposition, he stated that he routinely excludes exculpatory evidence when
preparing an affidavit of probable cause. He also testified that he was taught to
exclude such evidence by his superiors who told him he would be less likely to
get the warrant issued if he included such evidence.

37.     Detective Dusak was the assigned detective in the Berkleback murder investigation. He and Detective William Gross made affidavits for arrest and search warrants that were based on fabricated evidence and/or coerced statements.  These actions, and the Defendants' concealment of Dusak's prior misconduct violated Mr. Waller's right to due process and a fair trial.

38.     Naeem Waller was the victim of constitutional violations that caused him to serve a prison sentence of more than two decades. In addition to having suffered such a deprivation of rights, Naeem Waller is also actually innocent of the murder of Brian Birkelback. This fact has now been reinforced by the testimony of Timothy Moses. In 2015, Waller received an affidavit from Timothy Moses stating that he knew that the murder was committed by "Stan" who had confessed the crime to Moses immediately after it happened.

39.     Moses later appeared before the Honorable Lillian Ransom in connection with Mr. Waller's PCRA Application. Moses testified in a manner consistent with the information in his affidavit. Judge Ransom found Moses to be credible and approximately 90 days later vacated Mr. Waller's conviction.

40.     Timothy Moses' testimony implicating "Stan" as the real killer is corroborated by a statement taken by Dusak as part of the investigation. Christina Walton gave a statement to homicide detectives indicating that she knew Stan to be the actual killer. The date of that statement is April 18, 2002, just days after the murder. Despite this information, none of the Defendants herein made any attempt investigate Stan's culpability.

41.     The PCRA court found Timothy Moses to be credible and vacated Mr. Waller's conviction. In so doing, the state court implicitly found that testimony offered by Tyron Rouse could not be true because it is directly contradicted by the Moses testimony.

42.     The Commonwealth appealed Judge Ransom's ruling, but then withdrew the appeal in December of 2022. Thereafter, Mr. Waller, who remained a prisoner even though his conviction had been vacated, was offered a deal whereby he would plead guilty to a lesser crime and be able to regain his freedom.

43.     After having spent more than two decades in state prison for a crime he did not commit, Mr. Waller pled guilty and was released.

## PATTERN AND PRACTICE

44.     The actions and conduct of the individual defendants as described above violated the plaintiff's Fourteenth Amendment right to due process of law and a fair trial.

45.     The Defendant officers were deliberately deceptive by concealing evidence from the defense, information about Tyron Rouse's mental illness and Detective Dusak's extensive record of prior misconduct and thereby violated the plaintiff's Fourteenth Amendment right to due process of law and a fair trial.

46.     As a result of the actions and inactions of the defendant officers, Naeem Waller was compelled to stand trial in a murder case, causing him substantial harms. For many years, dating back at least to the 1970's, and continuing well beyond the investigation into the death of Brian Birkelback, the City of Philadelphia had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees.

47.     This policy, practice, or custom involved the use of various techniques to coerce incriminating statements, including without limitation: isolation; separating juvenile or otherwise vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly prolonged interrogations; making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement and/or be given favorable treatment; the use or threat of physical violence; authoritative assertions of a suspect's guilt, including without limitation confrontation with false inculpatory evidence; and providing false assurances—including to juveniles and other vulnerable people—that the suspect or witness will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

48.     This policy, practice or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation, providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication, taking misleading steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation, selectively documenting a witness or suspect's eventual statement and not the preceding interrogation, preparation and rehearsal, and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words.

49.     These practices were well known to Defendant City, and its policymakers, with respect to criminal investigations and prosecutions as a result of newspaper investigations, including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977-1978, governmental investigations, complaints from lawyers and civilians, and internal police investigations, including the PPD's 39th District Corruption Scandal in the 1990's, complaints lodged by the public, prior litigation and internal police investigations.

50.     The 39th District Corruption Scandal involved widespread unconstitutional practices that were not appropriately addressed or remediated despite pervasive knowledge throughout the PPD and Defendant City. The police misconduct in the 39th District Corruption Scandal included constitutional violations that mirror those violations suffered by Naeem Waller including omission of material information and suppression of exculpatory evidence, physical abuse and coercive interrogation tactics, and false allegations of criminal conduct. The PPD was deliberately indifferent to the officer's misconduct and credible complaints to their internal compliance department were disregarded.

51.     Various cases demonstrate that this misconduct was pervasive within the PPD at time of the investigation into Brian Birkleback's murder and the subsequent prosecution of Naeem Waller. This misconduct was pervasive within the PPD's Homicide Unit before and after its investigation of Naeem Waller and, upon information and belief, the misconduct described in this Complaint was expressly or tacitly committed or deliberately ignored when committed in the presence of the Homicide Unit and the PPD supervisors or because of their deliberate. indifference to this misconduct.

52.     Numerous other convictions that later resulted in exonerations demonstrate the pervasive patterns, practices and customs of official misconduct within the Homicide Unit of the PPD include:

    a.  Raymond Carter

    b.  Anthony Wright

    c.  Eugene Gilyard

    d.  Lance Felder

    e.  Carlos Hernandez

f.   Ed Williams

g.   Jackie Combs, Jr.

h.   Willie Veasy

i.   Percy St. George

j.   Jimmy Dennis

k.   Donald Ray Adams

l.   Andrew Swainson

m.   Walter Ogrod

n.   Shaurn Thomas

o.   Terrance Lewis

p.   Donald Outlaw

q.   James Frazier

r.   Christopher Williams

s.   Chester Holman

t.   Willie Stokes

u.   Dwayne Handy

53.     As a result of a pattern of police misconduct that was in effect at the time of the investigation of the murder of Brian Birkelback for which Naeem Waller was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of *NAACP v. City of Philadelphia* requiring widespread reforms in the PPD, while also limiting certain aspects of their investigative practices and policies.

54.     This practice, as exemplified by the investigation into Naeem Waller's wrongful conviction, and those detailed hereinabove, continued for years due to the deliberate indifference of the PPD and Defendant City to these policies, practices and customs.

55.     During the 1980's and early 1990's, and concurrent with the time of the investigation and prosecution of Naeem Waller by the PPD, there was, within the PPD a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments. On three (3) separate occasions in the 1980's, courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices:

    a. **Cliett v. City of Philadelphia:** Consent decree arising out of "Operation Cold Turkey", that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices);

    b. **Spring Garden Neighbors v. City of Philadelphia:** Enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation);

    c. **Arrington v. City of Philadelphia:** Enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

56.     In a more recent investigation into wrongful convictions in Philadelphia, Inquirer reporter Smantha Melamed spoke with former homicide detective Michael Chitwood. Chitwood, who went on to a long career as Upper Darby Police Chief, *admitted* to the Inquirer that training of homicide detectives was known to be inadequate:

> Back then, police didn't have the ample data available today: cellphone records, DNA analysis. And, like now, they were facing upward of 400 murders a year, hampered by witnesses too fearful to come forward. ***Chitwood said detectives were not formally trained to meet that challenge. They handled cases as they saw fit***.

> "There was no set standard. It was just: Solve the case," Chitwood said.

Philadelphia Inquirer, Losing Conviction, May 7, 2021;

https://www.inquirer.com/crime/a/philadelphia-murder-exonerations-wrongful-convictions-20210507.html

57.     At the time of the investigation and prosecution of Naeem Waller, the PPD had a practice, policy and custom of:

a.  Engaging in unlawful interrogation of suspects, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, and failing to disclose exculpatory evidence;

b.  Allowing detectives to engage in illegal and coercive tactics to secure evidence in homicide cases.

c.  Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

d.  Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

e.  Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and Defendants, including unlawful police interrogations, searches, arrests, coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence;

f.  Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging PPD police, including the Defendants in this case, to violate the rights of citizens, such as Naeem Waller.

58.     At the time of the investigation and prosecution of Naeem Waller, and for many years before and thereafter, the PPD and Defendant City has been deliberately indifferent to the need to train, supervise and discipline police officers. The Internal Affairs Division ("IAD") of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.  excessive and chronic delays in resolving disciplinary complaints;

b.   a lack of consistent, rational and meaningful disciplinary and remedial actions;

c.   a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.   the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e.   the PPD discipline, as practiced, was incident-based rather than progressive, thus, repeat violators were not penalized in proportion to the number of violations;

f.   the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.   a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.   serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.   lack of an effective early warning system to identify, track and monitor "problem" officers;

j.   IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.   IAD failed to acknowledge the disproportionate use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

59.   The PPD's conduct in this case was not an isolated incident and was instead the result of customs, policies and practices of the PPD prior to and at the time of the unlawful investigation into the murder at issue. The PPD, by and through its final policy makers, maintained an official policy, pattern, practice, or custom of suppressing coercing confessions and fabricating evidence in violation of Naeem Waller's and others' constitutional rights.

60.     Further, the PPD failed to train, educate, and supervise officers including

Detective Defendants regarding proper conduct in police work and investigations. Thus, the

Defendant Detectives and the PPD officers were inadequately educated and trained about their

constitutional and ethical responsibilities to criminal defendants. The lack of oversight of

Defendant Detectives and other homicide detectives in the PPD by the PPD compounded the

constitutional violations by eliminating any mechanism by which such violations would be

identified and rectified.

61.     Yet, the PPD and Defendant City, by and through its final policymakers,

implemented the policy, practice and customs of coercing jailhouse informants or other criminal

defendants into adopting fabricated statements for use in prosecuting and convicting persons of

interest in deliberate indifference to the substantial likelihood that these customs, practices, and

policies would result in constitutional violations like those that occurred in Naeem Waller's case.

62.     Such policies, customs and practices of the PPD were the moving force behind the

fabricated and coerced statement of Tyron Rouse, and its unlawful use in the conviction and

imprisonment of Naeem Waller.


DAMAGES

63.     The unlawful, intentional, willful, deliberately indifferent, and reckless acts and

omissions of the individual Defendants and the City of Philadelphia caused Mr. Waller to be

improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully

convicted and forced to serve over forty-six years in prison for a crime he did not commit.

64.     As a direct result of Defendants' conduct and omissions, Mr. Waller sustained

injuries and damages, including loss of freedom for more than twenty years, loss of his youth,

loss of his relationships with family members, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of life's pleasures, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment, and freedom of speech and expression.

65.     As a direct result of Defendants' conduct and omissions, Mr. Waller sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

66.     As a direct result of Defendants' conduct and omissions, Mr. Waller sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

**COUNT I**
**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial Under the Fourteenth Amendment**
**(Against All Individual Defendants)**

67.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

68.     The individual Defendants, acting with malice individually and in concert, and within the scope of their employment with the PPD and the City of Philadelphia, deprived Mr. Waller of his clearly established constitutional right to due process of law and to a fair trial by Deliberate Deception: the individual defendants deliberately deceived counsel and the court by concealing and/or suppressing relevant and material evidence that had been specifically

requested, was required to be handed over under law, was known to exist at the time it was

requested, and was purposefully suppressed in the interest of securing a wrongful conviction.

69.     The individual defendants performed the above-described acts under color of state

law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr.

Waller's clearly established constitutional rights. No reasonable officer would have believed the

conduct described above to be lawful in 2002.

70.     The acts and omissions by the individual Defendants described in the preceding

paragraphs were the direct and proximate cause of Mr. Waller's injuries as these Defendants

knew, or should have known, that their conduct would result in the wrongful prosecution,

conviction, and incarceration of Mr. Waller.


**COUNT II**
**42 U.S.C. § 1983 Civil Rights Conspiracy**
**(Against All Individual Defendants)**

71.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully

set forth herein.

72.     The individual defendants, acting within the scope of their employment and under

color of state law, agreed among themselves and with other individuals, to act in concert in order

to deprive Mr. Waller of his clearly established Fourteenth Amendment rights to be free from

deprivation of liberty without due process of law, and to a fair trial.

73.     In furtherance of the conspiracy, the defendants engaged in and facilitated

numerous overt acts, including, but not limited to the following:

     a.  Suppressing information about Tyron Rouse's mental health history;

     b.  Fabricating the statement and testimony of Tyron Rouse; and

c.    Suppressing information regarding Dennis Dusak's prior history of misconduct.

74.    Defendants' acts and omissions, as described above, were the direct and proximate cause of Mr. Waller's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Waller's denial of due process and a fair trial.


**COUNT III**
**42 U.S.C. § 1983 Failure to Intervene**
**(Against All Individual Defendants)**

75.    Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

76.    By their conduct and under color of state law, the individual Defendants, acting within the course and scope of their employment with the Philadelphia Police Department had opportunities to intervene on behalf of Mr. Wallerr to prevent his wrongful conviction and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

77.    These Defendants' failures to intervene violated Mr. Waller's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 2002 would have believed that failing to intervene to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Waller to be wrongfully convicted, were lawful acts.

78.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Waller's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Waller's wrongful conviction and incarceration.

**COUNT IV**
**42 U.S.C. § 1983 Municipal Liability Claim**
**(Against Defendant City of Philadelphia)**

79.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

80.     The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Waller's wrongful conviction, and for many years preceding and following this investigation a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence.

81.     Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; fabricating inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses,

21

suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

82.     Mr. Waller's injuries and damages were further proximately caused by policies and practices on the part of policymakers with responsibility of administration of the District Attorney's office to allow the withholding of exculpatory and/or inconsistent evidence, allow witness to provide false testimony, and to pursue profoundly flawed investigations and prosecutions.

83.     The widespread practices described in the preceding paragraphs, of which the City of Philadelphia had actual or constructive notice, were allowed to flourish because the Police Department and District Attorney's office declined to implement sufficient training and/or any legitimate mechanisms for oversight or punishment.

84.     Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Waller's wrongful conviction over twenty years of incarceration, as well as all the other injuries and damages set forth above.


<u>PUNITIVE DAMAGES</u>

85.     Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

86.     The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

87.     As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

a.  That the Court award compensatory damages to Plaintiff and against all
    Defendants, jointly and severally, in an amount to be determined at trial;

b.  That the Court award punitive damages to Plaintiff, and against all individual
    Defendants in their individual capacity, in an amount to be determined at trial,
    that will deter such conduct by Defendants in the future;

c.  A declaratory judgment that the practices and policies complained of are
    unconstitutional;

d.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs,
    including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42
    U.S.C. § 1983 claims; and

e.  For such other and further relief as appears reasonable and just.


                                MARRONE LAW FIRM, LLC

                                By:___s/ Michael D. Pomerantz_____
                                      Michael D. Pomerantz, Esquire
                                      PA Atty ID# 83415
                                      Attorneys for Plaintiff
                                      200 South Broad Street, Suite 610
                                      Philadelphia, PA  19102
                                      (215) 732-6700
                                      mpomerantz@marronelaw.com

Date: May 24, 2024